# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

FILED
JAN 1 7 2020
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

UNITED STATES OF AMERICA

v.

THEODIS LAMOND JEFFERSON

**CRIMINAL COMPLAINT**

CASE NUMBER: W20-13M

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From in or around **January 2015 and continuing through in or around June 2015,** in **Bell** County, in the **Western** District of **Texas**, defendant(s), **aided and abetted by another, did knowingly and willfully pay or offer to pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to Tricare beneficiaries and physicians in return for purchasing and ordering prescription compounded drugs, services and items for which payment may be made in whole or in part,** in violation of Title **42**, United States Code, Section(s) **1320a-7b(b)(1)**, and Title **18**, United States Code, Section **2**.

I further state that I am a(n) **Special Agent, U. S. Army Criminal Investigation Division, Major Procurement Fraud Unit,** and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

continued on the attached sheet and made a part hereof: YES

RICKY L. WELTON, Special Agent
U. S. Army Criminal Investigation Division
Major Procurement Fraud Unit

Sworn to before me and subscribed in my presence,

January 17th, 2020
Date

Waco, Texas
City and State

Jeffrey C. Manske
U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer



FILED
JAN 17 2020
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT

I, Ricky L. Welton, being first duly sworn, hereby depose and state as follows:

**AFFIANT**

1. I am a Special Agent with the U.S. Army Criminal Investigation Division's Major Procurement Fraud Unit (Army CID) and have been employed with Army CID since April 2019. I am a federal law enforcement officer of the United States and I am authorized by law to conduct investigations and make arrests for felony offenses. Since in or about April 2019, I have been assigned to a unit specializing in investigations of fraud against the Department of Defense, bribery of public officials, conflict of interest and money laundering. During my tenure, I have worked extensively on fraud and public corruption cases and thus I am familiar with the techniques, strategies, and behavior of individuals who have defrauded or stolen from the U.S. government, and who seek to conceal such illicit activities from detection by law enforcement. Prior to my current position I was employed by the U.S. Marshals Service as a Deputy U.S. Marshal from August 2006 through April 2019 investigating various state, local, and federal crimes.

2. I have personally participated in this investigation as well as overseen the investigation. The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation from other individuals, including other law enforcement officers, interviews of cooperating individuals as described to me by other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.

## PURPOSE OF AFFIDAVIT

3. I make this Affidavit for the limited purpose of establishing probable cause in support of a criminal complaint and arrest warrant against Theodis Lamond JEFFERSON for Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349, Receipt of Illegal Remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(1), Payment of Illegal Remuneration, and Aiding and Abetting Payment of Illegal Remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2.

Title 42, U.S.C. § 1320a-7b(b) states:

(1) whoever knowingly and willfully solicits or receives any remunerations (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
   (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
   (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony; and

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
   (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be mad in whole or in part under a Federal health care program, or
   (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony.

This affidavit does not set forth each and every fact that I or others have learned during the course of this investigation.

2

## INTRODUCTION

4. In September of 2015, Special Agents with Army CID and the Defense Criminal Investigative Service (DCIS) received information that JEFFERSON, an enlisted U.S. Army service member assigned to Ft. Hood, TX, engaged in a conspiracy to defraud the U.S. Government through exploitation of medical benefits offered through TRICARE which was administered by the Defense Health Agency. From approximately January 2015 to June 2015, JEFFERSON received in excess of $5.9 million dollars to both his personal bank account and through his company, Military Money Now (MMN). The source of the $5.9 million originated from Compound Marketing Groups and Compounding Pharmacies.

5. Based on the evidence to date, JEFFERSON devised and executed a scheme to defraud TRICARE by making and receiving payments in connection with the prescription of compounded drugs to TRICARE beneficiaries. These payments included: payments to TRICARE beneficiaries in exchange for filling prescriptions for compounded drugs; (b) payments to physicians in exchange for prescribing compounded drugs to TRICARE beneficiaries; and (c) the receipt of payments by JEFFERSON from pharmacies through Compound Marketing Groups in exchange for referring TRICARE beneficiaries and their prescriptions for compounded drugs to the pharmacies.

6. It was a purpose of the conspiracy for JEFFERSON and his coconspirators to unlawfully enrich themselves through the submission of claims to TRICARE for compounded drugs prescribed to TRICARE beneficiaries, which prescriptions had been induced by kickbacks paid to the prescribing physicians, and by kickbacks paid, or promised to be paid, to TRICARE beneficiaries, and to conceal those facts from TRICARE.

## BACKGROUND

7. TRICARE was a health care program of the United States Department of Defense (DoD) Military Health System that provided coverage for DoD beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries. The Defense Health Agency (DHA), an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

8. TRICARE was a "health care benefit program" as defined by 18 U.S.C. § 24(b), that affected commerce, and as that term is used in 18 U.S.C. § 1347. TRICARE was a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce, and as that term is used in 42 U.S.C. § 1320a- 7b(b).

9. In general, "compounding " is a practice in which a licensed pharmacist, a licensed physician, or an outsourcing facility, where a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient. Compounded drugs are not FDA-approved, that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. The Texas State Board of Pharmacy regulates the practice of compounding in the State of Texas. Compounded drugs may be prescribed by a physician when an FDA- approved drug does not meet the health needs of a particular patient. For example, if a patient is allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug can be prepared excluding the substance that triggers

4

the allergic reaction. Compounded drugs may also be prescribed when a patient cannot consume a medication by traditional means, such as an elderly patient or child who cannot swallow an FDA-approved pill and needs the drug in a liquid form that is not otherwise available.

## IDENTIFICATION OF PARTIES

10. Theodis Lamond JEFFERSON, a separated U.S. Army service member stationed at Fort Hood, TX, owned and operated Military Money Now and was its sole proprietor.

11. Military Money Now (MMN) was a Nevada limited liability company formed February 2, 2015 that had a principal place of business in Killeen, TX. Military Money Now self identifies as a Money Service Business that provides loans to military members. In fact, records indicate Military Money Now primarily marketed compounded pain and scar creams to current and former members of the U.S. military and their families (TRICARE beneficiaries) on behalf of various Compound Marketing Groups and Compounding Pharmacies.

12. Supreme Medical Solutions (Supreme) was a Tennessee Limited Liability Company formed November 6, 2012 which self-described as a national medical sales and consulting organization representing unique medical products and services.

## INVESTIGATION AND FACTS SUPPORTING PROBABLE CAUSE FOR ARREST

13. On August 18, 2015, agents received information that JEFFERSON received in excess of $5 million from Supreme Medical Solutions. A document provided to open a bank account described MMN as a "marketing group for different pharmacies." In addition to the funds received, records indicated a large portion of the money was transferred to at least 20 U.S. Army service members who were TRICARE beneficiaries.

14. On December 8, 2015, agents interviewed Sergeant First Class Kerry Walker, an active duty U.S. Army service member assigned to Ft. Hood, TX. Walker admitted JEFFERSON paid him in exchange for filling prescriptions for compounded drugs and to recruiting other TRICARE beneficiaries (military service members) and paying them, at the direction of JEFFERSON, in exchange for filling prescriptions for compounded drugs. Walker told investigators JEFFERSON gave him cash to pay the TRICARE beneficiaries he recruited.

15. On December 8, 2015, agents interviewed Staff Sergeant John Gaskin, an active duty U.S. Army service member assigned to Ft. Hood, TX. Gaskin stated JEFFERSON paid him between $300.00 to $500.00 in exchange for filling prescriptions for compounded drugs. Further, Gaskin stated he signed up with JEFFERSON to recruit other TRICARE beneficiaries, and was paid $900.00 for every beneficiary he recruited. Gaskin stated JEFFERSON also instructed him to pay $300.00 to $500.00 to TRICARE beneficiaries who he recruited to fill prescriptions for compounded drugs.

16. On December 10, 2015, agents interviewed Mr. Danny Diaz, a former active duty U.S. Army service member assigned to Ft. Hood, TX. Diaz admitted JEFFERSON paid him from $300.00 to $500.00 in exchange for filling prescriptions for compounded drugs. Diaz stated he signed up with JEFFERSON to recruit other TRICARE beneficiaries, and was paid from 10 percent to 12 percent of what TRICARE paid to the pharmacy for every beneficiary he recruited. Further, Diaz advised he was aware that JEFFERSON paid Dr. Jeffrey D. Durgin in exchange for prescribing compounded drugs to TRICARE beneficiaries. Diaz stated he accompanied JEFFERSON and Mr. Jesse Myles to Midland, TX, to pay Dr. Durgin $12,000 to $15,000 in cash.

17. On March 3, 2016 agents interviewed Mr. Andy Pichardo, a former active duty service member stationed at Fort Hood, TX. Pichardo stated that JEFFERSON paid him $700.00 in exchange for filling prescriptions for compounded drugs. Pichardo stated that JEFFERSON also paid him $200.00 to $250.00 for every TRICARE beneficiary he recruited to fill prescriptions for compounded drugs. Pichardo advised he was directed by JEFFERSON to pay TRICARE beneficiaries in order to "entice" them to fill prescriptions for compounded drugs. Pichardo recalled that after JEFFERSON wired money to Pichardo, Pichardo withdrew cash and paid JEFFERSON for doctor's fees.

18. On March 2, 2016, agents interviewed Mr. Anthony Hampton, a former active duty Warrant Officer stationed at Fort Hood, TX. Hampton stated that he worked as an independent sales representative for JEFFERSON, who he also knew as TJ. Hampton advised that JEFFERSON directed him to pay TRICARE beneficiaries $500 to $700 in exchange for filling prescriptions. Hampton explained that he would receive a direct deposit from JEFFERSON and then withdraw $500 to $600 in cash per person which he gave to JEFFERSON in order to pay a doctor. Hampton estimated he was paid approximately $70,000.00 by JEFFERSON.

19. On December 8, 2015, agents interviewed Mrs. Brittany Cobos, who stated she was hired by JEFFERSON to be his payroll specialist for MMN. Mrs. Cobos stated JEFFERSON appointed her as the Chief Financial Officer of MMN and paid Cobos $1,300.00 per week to handle the entire payroll for the sales representatives of MMN, which included calculating their pay based on patient prescriptions and contracted percentage rates, as well as "doctor's fees." Cobos explained she would receive a patient list from JEFFERSON or a pharmacy and have to determine which sales rep was owed a commission for that TRICARE beneficiary. Cobos explained that Dr. Jeffrey Durgin would prescribe the compounding drugs and in return he was paid cash in person.

Cobos explained that she routinely communicated with JEFFERSON through email and provided those emails.

20. A review of Cobos' email communications revealed the following emails:

a. On May 11, 2015 at 7:27 AM an email message from Cobos to approximately 43 different email addresses (most belonging to TRICARE beneficiaries) including JEFFERSON and Ms. Shaundria Scott (office manager for JEFFERSON). The email, with a subject line "DOC Fees", states that the "DOC Fees" were calculated incorrectly and that Cobos would be sending a "screen shot" of "Little York" and "Central" records. On May 11, 2015 at 7:34 AM Scott responds to Cobos that stating that Scott had been "calling the Dr. Fees…Consult Fees…" Your affiant knows that Little York and Central refers to compounding pharmacies who have been investigated for similar Healthcare Fraud schemes. Your affiant also believes that that this email is an indication that Cobos and Scott have knowledge that it is illegal to pay doctors in exchange for filling prescriptions for TRICARE beneficiaries.

b. On May 29, 2015 at 1:04 PM an email message from Cobos to Mr. Danny Diaz (a sales representative of JEFFERSON). The email, with a subject line "Pay", states, "I have attached your individual pay sheets for Little York…" Diaz responds to Cobos questioning what the "fee" is for and Cobos responds "consult/doctor fees." Your affiant believes that this email is further indication that Cobos is tracking "fees" that will be paid to a doctor.

c. On June 4, 2015 at 8:07 PM an email message from Cobos to Scott. The email, with a subject line "Rescarch", states, "Good evening, Thank you again for stopping by my house to bring the fees for Dr. Durgin. Can you please…"

8

    d.    On June 15, 2015 at 7:01 PM an email message from Cobos was sent to JEFFERSON. The email, with a subject line, "Dr. Durgin", states, "Ok so after totaling all the Dr fees for Dr. Durgin, subtracting the $9k I left with him on Saturday 6/13/2015 we still owe $12,300.00 for this payout. (total was $21,300.00). Let me know if you need me to do anything else." Your affiant believes this is indication that JEFFERSON is directing payment to Dr. Durgin.

    e.    On June 15, 2015 at 7:45 PM an email message from Cobos was sent to Mr. Justin Sapp (a sales representative of JEFFERSON). The email, with a subject line, "Individual Payout Sheet Little York May 1-31", states, "I have attached your individual payout sheets. Have a good evening." On June 15, 2015 at 7:48 PM Sapp responds to Cobos, "Brittany, everything looks good with the exception of my patient fees for my prescription. Thanks, Justin." On June 17, 2015 at 11:39 AM Cobos responds to Sapp, "Can you elaborate? Fees were withheld, but I'm not following what you are asking." On June 17, 2015 at 12:19 PM Sapp responds to Cobos, "Sorry for being unclear, I meant the payment for my personal prescription from TJ. Is it possible to send that together or do I need to get that directly from him? Thanks." On June 17, 2015 at 1:56 PM Cobos forwards the email to JEFFERSON, "Hey Justin is asking about his pay for his own prescription…you had told me to put him and Rawanda under you. Do I need to change that?" On June 17, 2015 at 2:28 PM JEFFERSON responds to Cobos ending the email by stating, "Leave them where they are and tell him to contact me." Your affiant believes this is evidence that JEFFERSON paid Sapp in return for filling a prescription.

    f.    On November 1, 2015 at 6:12 PM, an email message from Cobos was sent to JEFFERSON. The email, with a subject line, "Commissions", discusses the "commission structure." Cobos writes, "So there have been a couple questions on the new commission structure. Just so I'm clear, all agents will be paid 1x monthly at 25% (exception Winfrey, Detrice at 30%)

9

is that correct?" On November 2, 2015 at 9:28 AM, JEFFERSON responds to Cobos' email and states, "The only thing we have to take out is the 40.00 doc fee." On November 3, 2015 at 1:25 PM, Cobos responds to JEFFERSON asking, "What about the %25 All reps (Detrice Winfrey at 30) correct?" On November 3, 2015 at 1:26 PM, JEFFERSON responds to Cobos, "Yes." Your affiant believes not only is this evidence that JEFFERSON is unlawfully directing payments to a doctor in exchange for filling prescriptions, but that JEFFERSON is also directing payments to representatives based on a percentage paid by TRICARE. Your affiant knows that is illegal to pay a person based on the amount reimbursed by a Federal Healthcare Program.

21.     On May 10, 2015 at 9:02 PM, Cobos replied to an email from JEFFERSON with the subject line, "WORKING COPY OF CENTRAL with payouts." Attached to the email is a spreadsheet. Within the spreadsheet there were multiple tabs, the first labeled "Rx_Activity" and the remainder of the tabs labeled with the names "Danny Diaz," "Kerry Walker," "Theodis JEFFERSON" and many more. Each tab contains various columns with headings such as: "RX Number," "Patient Name," "Related Prescriber," "Prescription-Formula-Abbr," "Quantity Filled," "Insurance Paid," "Rx Activity Status," "Sales Rep Name." Your affiant believes this spreadsheet is evidence that JEFFERSON is directing a percentage of payments to representatives based on the amount paid by TRICARE.

22.     On December 8, 2015 agents interviewed JEFFERSON who advised he created MMN and modeled it after CMGRX, a company he used to work for. JEFFERSON admitted while working for CMGRX he paid TRICARE beneficiaries to fill prescriptions for scar and pain creams. According to JEFFERSON, he eventually realized paying TRICARE beneficiaries for prescriptions was illegal, quit working for CMGRX, and started MMN. JEFFERSON stated he made an agreement with the Pharmacy Central Rx Drugs (Central) out of Louisiana to receive 30

percent of what TRICARE paid per prescriptions. JEFFERSON stated he was paid by Supreme who he described as Central's agent. JEFFERSON further admitted that he paid agents under him from 12 to 15 percent of what TRICARE was reimbursed. JEFFERSON denied that he ever paid or induced payment to TRICARE beneficiaries for filling prescriptions, other than while working at CMGRX. JEFFERSON admitted that he made millions of dollars, but that he spent it all on gambling. JEFFERSON explained that he would charter private jets to Las Vegas where he would take his agents and friends. JEFFERSON advised that he quit selling creams when Central was no longer able to bill TRICARE.

### Payments from JEFFERSON to TRICARE Beneficiaries

23.     A review of bank records belonging to JEFFERSON revealed payments from approximately January 2015 to June 2015 to many "agents," whom were also TRICARE Beneficiaries, working under JEFFERSON who he directed to pay other TRICARE beneficiaries and kickback cash to JEFFERSON in order to pay doctors for prescribing compound drugs. An abstract of payment totals is as follows:

| PAYOR | PAYEE | TOTAL AMOUNT |
|---|---|---|
| JEFFERSON | Danny Diaz | $183,517.95 |
| JEFFERSON | Kerry Walker | $15,627.97 |
| JEFFERSON | Andy Pichardo | $14,436.04 |
| JEFFERSON | John Gaskin | $9,472.79 |
| JEFFERSON | Anthony Hampton | $77,209.04 |

### Receipt of Kickbacks from Compounding Marketing Companies and Pharmacies

24. A review of Bank Records belonging to JEFFERSON revealed from approximately January 2015 to June 2015, JEFFERSON received approximately $5.9 million from compound marketing companies and pharmacies. The following is an abstract of some payments:

| DATE | AMOUNT | DEPOSIT TYPE | NAME |
| --- | --- | --- | --- |
| 1/23/2015 | $ 32,410.84 | Wire | CCMGRX, LLC |
| 2/27/2015 | $ 30,000.00 | Check | Health West, LLC |
| 3/20/2015 | $ 339,428.29 | Wire | Supreme Med. Sol. |
| 4/3/2015 | $ 852,330.93 | Wire | Supreme Med. Sol. |
| 5/1/2015 | $ 19,022.61 | Wire | Trilogy Pharmacy |
| 6/9/2015 | $ 431,700.00 | Wire | Supreme Med. Sol. |

### Effect on TRICARE

25. Had DHA and TRICARE been aware that payments were being made to doctors, beneficiaries, and other individuals involved in the submission of claims for reimbursement for compounded drugs as set forth above, the claims would have been denied and not paid.

26. A review of TRICARE records from DHA revealed JEFFERSON and the coconspirators caused TRICARE to suffer an estimated loss of more than $24 million.

### CONCLUSION

27. Based on my training and experience and the foregoing facts, there is probable cause to believe that JEFFERSON did knowingly and willfully offer to pay and did pay remuneration directly and indirectly, overtly and covertly, in cash and in kind to TRICARE beneficiaries and physicians in return for ordering, and arranging for and recommending

12

purchasing, and ordering prescription compounded drugs, services and items for which payment may be made in whole or in part under a Federal health care program, namely, TRICARE.

_____
RICKY L. WELTON, Special Agent
U.S. Army Criminal Investigation Division
Major Procurement Fraud Unit

SWORN TO AND SUBSCRIBED before me on the 17th day of January, 2020.

_____
JEFFREY C. MANSKE
United States Magistrate Judge

13